IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION


UNITED STATES OF AMERICA,           )
                                    )
                Plaintiff,          )
                                    )
v.                                  )        Case No. 15-5044-01-CR-SW-BP
                                    )
ANDREW J. SISCO,                    )
                                    )
                Defendant.          )


REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant's Motion to Suppress Custodial

Statement. (Doc. # 30)  For the reasons set forth below, it is recommended that this motion be

denied.

I.  BACKGROUND

On December 8, 2015, defendant was charged in a three count indictment with

possessing firearms in and affecting interstate commerce after having been convicted of a crime

punishable by imprisonment for more than one year (Count I), receiving a fully automatic

machine gun which was not then registered to him in the National Firearms Registration and

Transfer Record (Count II), and possessing a silencer which was not then registered to him in the

National Firearms Registration and Transfer Record (Count III). (Doc. # 1)

On May 17, 2016, defendant filed a Motion to Suppress Custodial Statement. (Doc. # 30)

Defendant argues that defendant's verbal and written statements should be excluded from

evidence at trial as they were the product of an unconstitutional search and seizure of defendant

in violation of the Fourth and Fourteenth Amendments.  Defendant also contends that the

statements were not voluntary and were obtained in violation of defendant's Fourth, Fifth and Sixth Amendment rights.

An evidentiary hearing on the motion to suppress was held on September 7, 2016. Defendant was represented by Melanie Morgan and the government was represented by Assistant United States Attorney Patrick Carney. The government called as witnesses Sheriff Deputies David Mace and Chad Harris, Detectives William Pike and Travis Spencer and Lieutenant Trevor Williams.[1]

## II. FINDINGS OF FACT

On the basis of the evidence presented at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. Deputy David Mace was on patrol by himself between 1:00 and 2:00 a.m. on August 26, 2015. (Tr. at 4, 33) At approximately 1:25 a.m. while driving north on Highway 59, he saw a vehicle parked outside a storage lot with its headlights on. (Tr. at 4, 8) The storage lot is a series of storage sheds surrounded by an 8 foot chain link fence. (Tr. at 4) Several businesses are located nearby, but they were closed at that hour. (Tr. at 5) Deputy Mace turned around at the next intersection and drove back to the car. (Tr. at 5) When he returned, the vehicle's headlights were off. (Tr. at 5) That was significant to the deputy as it occurred to him that the individuals there had seen him drive by and they turned their headlights off to possibly conceal themselves. (Tr. at 34) Deputy Mace observed a female in the vicinity of the car and stopped to talk to her. (Tr. at 5) She identified herself as Angela Sisco. (Tr. at 5) She was going through what looked like rummage sale items or items that had come from a storage locker. (Tr. at 5, 10) She explained that the storage unit auctions off items from storage units that are not paid for and that people are allowed to go through and keep items that are not sold. (Tr. at 6) She indicated that there had been an auction earlier in the evening. (Tr. at 6) Because the deputy thought Ms. Sisco was acting nervous and jittery, he asked for consent to search her vehicle. (Tr. at 6) He also asked her to turn out her pockets on her pants and she complied. (Tr. at 6) She also consented to a

---

[1] Detective William Pike and Deputy Chad Harris testified concerning their role in applying for two separate search warrants. Their testimony primarily related to the motions seeking to suppress evidence obtained as a result of the search of storage units and a residence, doc. ## 28 and 29. This testimony will be considered in connection with these motions which will be the subject of a separate report and recommendation.

2

search of her vehicle. (Tr. at 7)

2. At the beginning of the vehicle search, Deputy Mace's attention was drawn from the search to a male subject who approached from the inside of the fenced area around the storage sheds. (Tr. at 7) Up until that time, the deputy was unaware that anyone else was at the storage facility. When asked, Ms. Sisco said she had not mentioned that anyone was with her because she did not feel that was relevant. (Tr. at 8-9) Ms. Sisco said that the individual was her son. (Tr. at 8) Deputy Mace did not assume that as her son he had the same last name. (Tr. at 25-26)

3. Deputy Mace approached the chain link fence and asked the male to identify himself. (Tr. at 9) The individual behind the fence did not comply with his request. (Tr. at 9) The deputy asked him to identify himself several times. (Tr. at 33) The deputy believes that he asked him for his ID. (Tr. at 9)  At this point, the individual was inside the fence and Deputy Mace was outside of the enclosure. (Tr. at 9) The deputy identified the defendant as the person he had contact with at the storage facility. (Tr. at 9-10)  At some point, Angela Sisco indicated that the man inside the fence was her son, but at the time he entered the fenced area, the deputy had not been able to confirm that. (Tr. at 33)

4. The deputy felt it was important to identify the defendant because it appeared to him that a burglary or some other crime was being committed. (Tr. at 10)  The deputy explained that Ms. Sisco was outside the fence going through items that looked like they came from a storage locker. The defendant was inside the fence. She had not mentioned him. When the defendant was asked why he was there at this time of the morning, he did not provide a reason, but just said there was twenty-four hour access to the facility. (Tr. at 10) Deputy Mace testified that at that point, the defendant did not say that he had rented storage units there. (Tr. at 11) The report prepared after the incident indicated that the defendant told the deputy he had units there before the deputy went inside the fenced area. (Tr. at 28)

5. Deputy Mace went around to the gate which has a keypad entry and asked the defendant for the key pad numbers to the gate, but he would not provide them. (Tr. at 11, 25) The deputy was able to push the gate open just wide enough so that he could fit through. (Tr. at 11) An individual could have pushed their way into the facility without actually opening the gate. (Tr. at 11) The deputy pushed through the gate because he believed it was necessary to identify the defendant and to make sure he had legitimate business there. (Tr. at 11, 16) Once he had identified the defendant, he had the number for the business and dispatch could call the owner of the business. After the events had transpired, dispatch was able to contact the owner of the storage facility and confirm that Mr. Sisco had units there. (Tr. at 12)

6. After pushing open the gate and going inside, Deputy Mace put the defendant in handcuffs.  He did this because he was not sure of the defendant's business there and

3

"it seemed to be sketchy, for lack of a better term." (Tr. at 12) What the deputy was seeing was what he would have expected to see at a burglary, although he did not use the term "burglary" in his report. (Tr. at 16, 32) The report written after the incident referred to the deputy as being suspicious. (Tr. at 32) The deputy did not observe damage to the fence and did not see the defendant with any tools. (Tr. at 25) The deputy has investigated probably hundreds of burglaries. (Tr. at 17) The defendant told the deputy that there was twenty-four hour access to the storage units. (Tr. at 19) Deputy Mace has investigated burglaries at storage units and some units have twenty-four hour access and some do not. (Tr. at 19) The deputy had reason to question whether this storage facility had twenty-four hour access because he patrols the area frequently, and he did not recall ever seeing a car there after hours. (Tr. at 20) There was no signage indicating twenty-four hour access to the facility. (Tr. at 34) A individual driving by would have had no way to know whether the facility was twenty-four access. (Tr. at 34). Additionally, even if the facility had twenty-four hour access that did not imply that this defendant had lawful authority to be there. (Tr. at 34)  Had the defendant demonstrated that he had the passcode that might have been a sign that he had lawful authority to be at the facility. (Tr. at 35) Even after the defendant told the deputy he had storage units at the facility, the deputy still thought something was amiss. (Tr. at 28-29) The deputy was of this opinion as the female outside the storage area was going through items that looked like they came from a storage shed, and the man inside the locked fence refused to identify himself. (Tr. at 29)

7. After handcuffing the defendant, the deputy frisked him for weapons and then removed his wallet from his back pocket in order to identify him. (Tr. at 13) It was the deputy's intention to obtain the defendant's identity in order to determine if he had a lawful reason to be at the facility. (Tr. at 36) The defendant had two identification cards in his wallet. (Tr. at 14) The deputy ran one through dispatch and it came back with warrants. (Tr. at 14)  The defendant then said that it was not his ID that he had found it. (Tr. at 14) The deputy then located another ID in the wallet that matched the defendant. (Tr. at 14) He ran that ID through dispatch for warrants and also used that information to contact the business to see if defendant had storage units there. (Tr. at 14) After running the information through dispatch, it returned with felony warrants out of Benton County, Arkansas. (Tr. at 15) Defendant was already in handcuffs and was placed under arrest as a result of the Arkansas warrants. (Tr. at 15)

8. The deputy then asked if the defendant would show him the lockers he had rented. He took the deputy to the door of one locker and said it was his. (Tr. at 15) The deputy asked for consent to search and the defendant denied consent. (Tr. at 15)  Defendant was then taken to the Newton County Jail for processing. (Tr. at 16)

9. Detective William Pike of the Newton County Sheriff's Office testified that the defendant had been a person of interest because he had been stopped with drugs on his person on August 19, 2014 and January 22, 2015. (Tr. at 42, 51)

4

10. Additionally, David Mitchell had been arrested at the same storage facility a week prior to the defendant's arrest and found with 15 grams of drugs. (Tr. at 52) In July of 2015, another detective had learned from a Walmart employee that Mr. Mitchell had sent a money order to the defendant. (Tr. at 52) However, Detective Pike did not do any follow-up to corroborate the information about the money order or to ascertain its amount. (Tr.at 53)

11. On August 19, 2014, when the defendant was stopped and found in possession of methamphetamine, he also had keys to storage units. (Tr. at 53) However, no one talked to the storage unit to find out if defendant actually had units there. (Tr. at 54)

12. Detective Travis Spencer, a narcotics detective with the Newton County Sheriff's Department, along with another detective, Chad Harris, interviewed the defendant at 9:30 a.m. on the morning of August 27, 2015. (Tr. at 68, 70) The entire interview was recorded. (Tr. at 69; Gov. Ex. 3) At the beginning of the interview, the defendant was read his <u>Miranda</u> rights, and he waived those rights and agreed to speak to the detectives. (Tr. at 69; Gov. Ex. 3)

13. The interview began around 9:30 a.m. and lasted a little less than an hour. (Tr. at 70) According to Detective Spencer, during the interview, the defendant never revoked his <u>Miranda</u> rights and never asked that the detectives stop questioning him. (Tr. at 71) The detectives were aware that the defendant was familiar with the criminal justice system and had prior convictions. (Tr. at 71) Defendant never indicated that he was not aware of what was going on. (Tr. at 71) Detective Spencer had no indication that the defendant was under the influence of alcohol or illegal substances. (Tr. at 72) Although the defendant can be seen yawning in the videotape of the interview, he never indicated he was too sleepy to continue or that he wanted to go to bed. (Tr. at 72) Defendant never indicated he had been denied water or was somehow physically inhibited so that he could not answer questions. (Tr. at 73)

14. Detective Spencer testified that the tone and the tenor of the conversation was casual and there was no cursing or yelling. (Tr. at 73) Nor did the detectives lie to the defendant at any point in time. (Tr. at 73)

15. Defendant admitted to possessing firearms at both the storage unit and his residence. (Tr. at 73-74) He was only two to three minutes into the interview when he admitted to possessing the MAC 11 firearm. (Tr. at 74)

16. Of his own violation, defendant wrote out a statement explaining that his mother was not involved with any of the stolen property. (Tr. at 75; Gov. Ex. 4)

17. Lieutenant Trevor Williams who is in charge of the Newton County Jail testified concerning jail procedures at the facility where the defendant was housed after his

5

arrest. (Tr. at 84) Government Exhibits 5 through 12 accurately depict the condition of Pod D of the Newton County Jail where the defendant was housed on August 26 and 27, 2015. (Tr. at 85, 89)

18. With respect to jail procedures, Lieutenant Williams testified that lights are out at 10:00 p.m. on weekdays and 11:00 p.m. on the weekend. (Tr. at 86) Breakfast is served at 6:00 a.m. (Tr. at 86) An inmate is not required to get up for breakfast and after breakfast, they could go back to bed if they wanted to. (Tr. at 86) There is no time restriction as to when inmates may use the toilets or take a drink. (Tr. at 88)

19. The Newton County Jail uses inmate request forms if the inmates need to request something or register a complaint. (Tr. at 88) Government Exhibits 13 through 16 are the request forms filled out by the defendant while housed at the jail and are dated August 28 through September 2, 2015. (Tr. at 89) One request asks for a new mattress due to his scoliosis issues. (Tr.at 90) However, the defendant never indicated he was unable to sleep or was being kept from sleeping. (Tr. at 90)

### III. ISSUES RAISED BY THE TERRY STOP AND FRISK

Defendant contends that the investigation into the defendant's presence at the storage unit was improper for the following reasons: there was no probable cause or reasonable suspicion of criminal activity, Deputy Mace had no grounds to go inside the fence of the storage unit where the defendant was located, and the search of defendant's pocket for identification was improper because the deputy lacked probable cause or reasonable suspicion. (Doc. # 30 at 2-7) In response, government counsel maintains that the Terry stop and efforts to identify the defendant were constitutional. (Doc. # 32 at 9-15) While defendant's motion refers both to a lack of probable cause and a lack of reasonable suspicion, it is clear from the government's response that the initial investigation into the presence of the defendant and his mother at the storage facility was undertaken pursuant to Terry v. Ohio, 392 U.S. 1, 30 (1968).

### A. Permissible Scope of a Terry Stop

The Fourth Amendment protects against unreasonable searches and seizures by the government. See United States v. Arvizu, 534 U.S. 266, 273 (2002). Where a police officer has

6

reasonable suspicion that criminal activity may be afoot, the officer may briefly stop an individual and make reasonable inquiries aimed at confirming or dispelling the suspicion.  See Minnesota v. Dickerson, 508 U.S. 366, 373 (1993)(citing Terry v. Ohio, 392 U.S. 1, 30 (1968)).

An officer's reasonable suspicion that criminal activity is afoot must be based on the totality of the circumstances.  See United States v. Arvizu, 534 U.S. at 273.  However, a mere hunch is not sufficient to provide reasonable suspicion.  See Illinois v. Wardlow, 528 U.S. 119, 124 (2000). The government must prove that the officer had reasonable suspicion that criminal activity was afoot, not that the subject of the stop was actively engaged in a crime. See United States v. Carpenter, 462 F.3d 981, 986 (8th Cir. 2006), cert. denied, 549 U.S. 1343 (2007).

In determining whether an officer has reasonable suspicion, courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. at 273(quoting United States v. Cortez, 449 U.S. 411, 417–18 (1981)). Additionally, officers are permitted "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" Id. (quoting Cortez, 449 U.S. at 418) See also United States v. Beck, 140 F.3d 1129, 1136 (8th Cir. 1998).

During a Terry stop, the officer may do a pat-down search for protective reasons "if he has a reasonable, articulable suspicion that the person may be armed and presently dangerous." United States v. Davison, 808 F.3d 325, 329 (8th Cir. 2015)(citation omitted). There must be articulable and specific facts as to dangerousness. See Sibron v. New York, 392 U.S. 40, 64 (1968)("In the case of the self-protective search for weapons, [the officer] must be able to point to particular

7

facts from which he reasonably inferred that the individual was armed and dangerous.") In determining whether the frisk was justified, this Court must look to the totality of the circumstances. See United States v. Hanlon, 401 F.3d 926, 929 (8th Cir. 2005). During a Terry stop, officers may check for weapons and take additional steps reasonably necessary to protect their personal safety and maintain the status quo during the course of the stop, including using handcuffs, but they must employ the least restrictive means. See United States v.Thomas, No. CR05-0055-LRR, 2005 WL 1876290, at *5-6 (N.D. Iowa Aug. 8, 2005). In order to seize items other than a weapon during a Terry pat-down, the officer conducting the pat-down must have probable cause to believe that the item in plain touch is incriminating evidence. See United States v. Craddock, 841 F.3d 756, 759 (8th Cir. 2016).

### B. Application of the Legal Standard to the Facts of This Case

Thus, when a Terry stop and frisk is challenged, as in the circumstances of this case, the Court must first determine if the officer had reasonable suspicion of criminal activity sufficient to allow the stop, and secondly, whether there were sufficient facts to warrant a suspicion that the individual might be armed and dangerous so as to allow a frisk for weapons.

Here, Deputy Mace observed a suspicious scene at 1:25 a.m. An individual, Angela Sisco, was seen standing next to a car with its headlights on while she rummaged through items[2] outside of a locked self-storage facility. (See Fact No. 1) After seeing the officer, the headlights of the car were turned off. (See Fact No. 1) The officer approached and talked to Angela Sisco

---

[2]  Although defendant categorizes the property as being "abandoned," and thus, corroborative of Angela Sisco's statement that it was left over from a sale, the deputy thought it consistent with the type of items one would find in a storage unit. Given the time of night and the circumstances, the officer was not required to believe Ms. Sisco's statement concerning how the property came to be by the side of the road.

8

about what she was doing at that hour of the morning. As the Deputy talked to Angela Sisco she appeared nervous and jittery. (See Fact No. 1) The items that Angela Sisco was looking through were of the type that the officer would have expected to find in a storage facility.

During the initial encounter, Angela Sisco did not mention there was someone else with her until a man appeared on the inside of the storage facility. She indicated that the man was her son. (See Fact No. 2) The man behind the fence refused to identify himself despite several requests by the deputy that he do so. (See Fact No. 3) He also refused to provide the code for the gate or to open it. (See Fact No. 5) There was enough space at one point in the fence for an intruder to gain access to the facility—as demonstrated by the officer's ability to squeeze through this area in the fence. (See Fact No. 5) The deputy drove by this area regularly while on routine patrol and had never noticed anyone at the facility at this time of night. (See Fact No. 6) The deputy had investigated numerous burglaries throughout his career and felt that some of what he was observing was consistent with a possible burglary. (See Fact No. 6)

Contrary to defendant's argument, these facts provide reasonable suspicion sufficient for the deputy to stop and inquire further of Angela Sisco and the defendant in an effort to dispel or confirm his suspicions that criminal activity might be occurring.

Upon entering the common area of the storage facility,[3] the deputy handcuffed and frisked the defendant for weapons. (See Fact No. 7) No weapons or other material of evidentiary value were found during this frisk. Thus, to some extent, the issue of whether Deputy Mace had

---

[3] Defendant argued that Deputy Mace improperly entered the common area of the storage facility. However, for the reasons discussed in the government's brief, defendant does not have standing to challenge the deputy's entrance into the common area of this facility. (See doc. # 32 at 13-15) Officers did not enter the defendant's locked storage units until they had obtained a warrant. (Tr.at 15, 43)

9

reasonable, articulable suspicion that the defendant might be armed and dangerous is irrelevant to the issues before the Court. However, given the circumstances outlined above, the Court will assume that sufficient grounds for a frisk existed.

Defendant contends that the deputy exceed the parameters of a Terry stop when he searched defendant's wallet for some form of identification. (Doc. # 30 at 7) In response, the government maintains that when the defendant refused to identify himself, the deputy had only two choices--withdraw from the scene and potentially allow a crime to be perpetrated or conduct a Terry stop, obtain identification and confirm that the defendant was permitted to be at the facility. (Doc. # 32 at 12) The government cites no authority for its claim that as part of a Terry stop, officers may search a suspect's wallet for evidence of identification, and the Court has not been able to locate any case support for the government's position in the circumstances of this case.

A similar issue was presented in United States v.Thomas, No. CR05-0055-LRR, 2005 WL 1876290, at *5-6 (N.D. Iowa Aug. 8, 2005), which began with a Terry stop at a bus station. Officers had received information that a suspect in a shooting death in Chicago might be on a bus arriving in Cedar Rapids. Officers conducted a Terry stop of the defendant, whom they thought looked like a picture of the suspect, Markell Lane. The defendant identified himself as Donnell Thomas which officers later discovered was actually his brother's name. He provided other information including that he had a brother by the name of Craig Thomas. Officers did not believe that the individual was being truthful about his identity and during the Terry stop pulled out paperwork from his pocket which was in the name of C. Thomas. The district court concluded that the search of the defendant's pocket was not authorized as the officer did not have a search warrant or an arrest warrant and probable cause for either was lacking at the time of the

10

search. Thus, the search of the defendant's pocket for the identification paperwork was held to be illegal. Id. at *8.

Similarly, in the context of a civil rights action, the United States District Court for the Eastern District of New York agreed with the plaintiff that the search of his pants pocket to obtain identification exceeded the scope of what was permitted during a Terry stop. The court found that Terry only authorizes a limited search of the outer clothing of an individual in an attempt to discover weapons which might be used to assault the officer. Evans v. Solomon, 681 F.Supp.2d 233, 247-48 (E.D. N.Y. 2010).

The Court agrees with the defendant that the deputy's search and seizure of identification documents during the Terry stop was a violation of the Fourth Amendment. Defendant claims that this constitutional violation warrants the suppression of his later in-custody statement as a fruit of the poisonous tree. (Doc. # 30 at 6-7) The government's initial briefing failed to address the issue of the proper remedy for this constitutional violation, despite the fact that the Supreme Court has recognized several exceptions to the exclusionary rule involving the causal relationship between the unconstitutional act and the discovery of the evidence. See Utah v. Strieff, 136 S.Ct. 2056, 2061 (2016). Thus, the Court gave the parties an opportunity for briefing on the question of the admissibility of evidence seized following the unconstitutional search of the defendant. (Doc. # 43)

## C. Exceptions to the Exclusionary Rule

### 1. Inevitable Discovery

In response to the Court's request for additional briefing, the government maintains that both defendant Sisco's identity and the evidence in the storage units would have been inevitably

11

discovered:

> The purpose of Dep. Mace's stop was to ascertain whether Sisco had a legal right to be on the property. Sisco's identity would have inevitably been discovered, because the officer would not have discontinued his contact until he obtained the information essential to determining whether a crime was being committed. Ultimately, the stop could not be concluded until the officer discovered the defendant's identity. See *United States v. Thomas*, CR05-0055-LRR, 2005 WL 1876290, *8 (N.D. Iowa Aug. 8, 2005) ("In sum, because it was inevitable that Defendant's true identity would have been discovered, there is no need to suppress this evidence.")

> The second prong of the inevitable discovery doctrine is also met, because at the time Dep. Mace seized Sisco's wallet, a separate investigation involving Sisco's drug activities was already underway and was completely independent of any illegality in his arrest for an outstanding out-of-state warrant. Hence, the evidence recovered from the storage units would have nevertheless been discovered, because the Newton County Sheriff's office was already investigating Sisco for drug trafficking; they were aware that he had storage units; they were aware that Sisco stored his drugs within the storage units; and they had recently arrested one of Sisco's acquaintances at the same storage facility for distributing methamphetamine just days before this encounter.

(Doc. # 44 at 7-8)(footnote omitted)   The inevitable discovery doctrine requires that the government prove two elements by a preponderance of the evidence: "(1) that there was a reasonable probability the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation." United States v. Glenn, 152 F.3d 1047, 1049 (8th Cir. 1998)(quoting United States v. Conner, 127 F.3d 663, 667 (8th Cir. 1997)).

With respect to the first prong, the inevitable discovery doctrine is not applicable if there is a "lack of specific details to support a conclusion that discovery was reasonably probable." United States v. Villalba–Alvarado, 345 F.3d 1007, 1020 (8th Cir. 2003). Regarding the second prong, the government must show "that there was, at the time of the [unlawful search], an actual other investigation that would have led to discovery of the otherwise unconstitutionally obtained

12

evidence." United States v. James, 353 F.3d 606, 617 (8th Cir. 2003).

In United States v. Thomas, No. CR05-0055-LRR, 2005 WL 1876290, at *7 (N.D. Iowa Aug. 8, 2005), following a Terry stop, officers unlawfully removed the defendant's bus ticket from his pocket in an effort to identify him. Prior to the officers removing the bus ticket with the name C. Thomas from his pocket, the defendant had identified himself as Donnell Thomas and said that his identity could be verified by his mother or brother, Craig Thomas, who also lived in Chicago. Id. at *3. In addition to unlawfully seizing the bus ticket from the defendant's back pocket, officers were attempting to discover the defendant's identity by asking additional questions, obtaining information from dispatch concerning the description of both Donnell and Craig Thomas and calling the name Craig to see if the defendant responded. Id. at *8. Both the district and appellate courts concluded these alternative lines of inquiry satisfied the second prong of the inevitable discovery test. Id. at *8.[4] See also United States v. Thomas, 524 F.3d 855, 859 (8th Cir. 2008). Thus, the courts concluded that the defendant's identity would have inevitably been discovered, thereby allowing police to arrest him on an outstanding warrant and search him incident to arrest. Thus, the evidence found during the search of defendant Thomas incident to arrest was admissible at trial as evidence that would have inevitably been discovered despite the unlawful search. See Thomas, 524 F.2d at 859; Thomas, 2005 WL 1876290 at *8.

In response to the request for further briefing, the prosecution now argues that the evidence in this case is admissible under the inevitable discovery doctrine. (Doc. # 44) However, at the

---

[4] The court noted that the narcotics officer indicated that in his experience, individuals stopped frequently attempt to identify themselves as a family member to hide their true identity. See Thomas, 2005 WL 1876290, at *8. The physical description that dispatch would have provided for Donnell Thomas would not have matched the individual whom the officers were questioning in either height or weight. Id.

13

time of the hearing, the government offered no evidence on either prong of this doctrine. The government simply asserts that the deputy would not have allowed defendant to leave without establishing his identity. (Doc. # 44 at 5-6) Yet, no testimony was offered concerning how his identity would have been lawfully discovered. For example, the government could have questioned the deputy on what standard identification procedure he uses when individuals refuse to identify themselves or provide false identification. In the unique circumstances of this case, where an individual who identified herself as the defendant's mother was present, the officer could have been asked about other ways he could have followed up on the defendant's name. However, the Court cannot speculate on what the deputy's response would have been to these hypothetical questions since they were not asked of the deputy or any other witness. Without any evidence, the Court cannot simply assume the applicability of this doctrine.

The government also claims it was inevitable that they would have obtained warrants for the storage units and residence given that defendant Sisco was suspected of being involved in a drug trafficking ring. (Doc. # 44 at 6-7) The pending Motion to Suppress Custodial Statement (doc. # 30) focuses on the deputy's action in searching the defendant for identification which led to his arrest on the Arkansas warrants and ultimately to his custodial statement. The custodial statement was given after the search of the storage lockers, not before. Initially, defendant sought to suppress evidence seized pursuant to the two search warrants only on the theory that probable cause for the issuance of the search warrants was lacking. (See Doc. ## 28 and 29) However, after the request for further briefing on how the Thomas case and the inevitable discovery doctrine applied to the Motion to Suppress Custodial Statement, doc. # 43, defendant argued for the first time that, but for the unlawful search of defendant's wallet for identification, law

14

enforcement would not have sought or obtained warrants for his residence or storage lockers. (Doc. # 45)

The government's supplemental brief addressed this issue, apparently anticipating that it would be raised. Thus, the Court will also consider defendant's new argument--that evidence obtained as a result of the execution of the search warrants at the residence and storage lockers, like the custodial statement, flowed from the improper Terry search, and thus, is inadmissible at trial. The testimony presented was that on two separate occasions, in August of 2014 and January of 2015, defendant Sisco had been stopped and found to be in possession of drugs. (See Fact No. 9) There was no evidence presented as to the specifics of any ongoing investigation of defendant Sisco that might have led to the issuance of search warrants for his residence or storage lockers[5]. Additionally, if evidence to support the warrants already existed, there was no evidence presented as to why they had not been sought earlier. Mr. Mitchell had been arrested at the storage facility a week earlier with 15 grams of drugs and information had been provided by a Walmart employee that Mr. Mitchell had sent the defendant a money order. (See Fact No. 10) However, no verification or follow-up of this information had been undertaken. (See Fact No. 10) There was no explanation of how any of this earlier information might have led to a warrant for the storage units or home of the defendant in August of 2015. Other than the suggestion that the defendant remained a person of interest, there was no information presented as to the details of any further investigation of the defendant that might have been underway in August of 2015[6].

---

[5] When asked about the statement in the search warrant that Mr. Sisco was suspected of moving large amounts of methamphetamine from Wichita, Kansas to Neosho, Missouri, Detective William Pike testified that "this was an ongoing investigation." (Tr. at 47) However, no other information concerning this "investigation" was presented.

[6] Detective Pike testified that another detective had not been able to figure out at which storage

15

The government's failure to prove by a preponderance of the evidence either prong of the inevitable discovery doctrine precludes the use of this doctrine as an exception to the exclusionary rule. Thus, the Court must consider the application of the attenuation doctrine.

2. Attenuation Doctrine

Under the attenuation doctrine

> [e]vidence is admissible when the connection between the unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that the 'interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'

Utah v. Strieff, 136 S.Ct. 2056, 2061 (2016)(citation omitted). In Utah v. Strieff, officers, upon stopping Edward Strieff and asking for his identification, discovered that he had an outstanding warrant for his arrest. When he was searched incident to arrest, officers discovered methamphetamine and drug paraphernalia. Id. at 2060. At a suppression hearing, the prosecutor conceded that the officer lacked reasonable suspicion for the stop, but argued that the evidence should not be suppressed because the existence of the valid arrest warrant "attenuated" the connection between the unlawful stop and the discovery of the drugs. The Utah trial court admitted the evidence, a ruling upheld by the state court of appeals. The Utah Supreme Court reversed finding that the evidence was inadmissible. Id. at 2060. The United States Supreme Court granted certiorari "to resolve disagreement about how the attenuation doctrine applies where an unconstitutional detention leads to the discovery of a valid arrest warrant." Id.

In reversing the Utah Supreme Court, the United States Supreme Court examined three factors--the temporal proximity between the unconstitutional conduct and the discovery of evidence to see how closely the discovery of the evidence followed from the unconstitutional

---

facility in Neosho that defendant had storage units. (Tr. at 54)

16

search, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct. Id. at 2062.  In Strieff, because only minutes elapsed between the illegal stop and the discovery of the drugs, the temporal proximity would favor suppression. Id.  However, the second factor--intervening circumstances--favored admission of the evidence.  The warrant was valid and unconnected with the stop.  The Court noted that once the officer discovered the warrant, he had an obligation to arrest the defendant. And once the officer had authority to arrest the defendant, it was lawful to search him incident to arrest. Id. at 2062-63. Finally, the third factor--the purpose and flagrancy of the officer's misconduct--reflects a policy of favoring exclusion of evidence only when the conduct is purposeful or flagrant. In Strieff the Court found no evidence of a purposeful or flagrant violation nor was there evidence that the unlawful stop was part of any "systemic or recurrent police misconduct." Id. at 2063.

Applying these factors to the present case compels the conclusion that the evidence flowing from the unconstitutional Terry search should not be excluded from evidence at trial.  Defendant was arrested in the early morning hours of August 26, 2015. The search warrants were obtained the afternoon and evening of August 26, 2015, more that twelve hours after the Terry stop. (Gov. Exs. 1 and 2)  Defendant was interviewed and gave a statement at around 9:30 a.m. on August 27, 2015.  (See Fact No. 12) Thus, the temporal period between the unlawful search of defendant's pocket for his identification and the issuance of the search warrants and his statement was hours rather than the minutes in the Strieff case.  However, even if the time between the stop and the warrants and the statement was not substantial, in this case, as in Strieff, a valid warrant for defendant's arrest predated the Terry stop. (See Fact No. 7)  Once the officer became aware of the warrant, he was mandated to arrest the defendant.  Finally, with respect to the third factor,

17

as in Strieff, no evidence was presented to suggest that the unlawful search for defendant's identification was purposeful or flagrant or part of any systemic or recurrent police misconduct.

While the Strieff case involved an unconstitutional stop as opposed to an unconstitutional search, the holding was intended to address the issue of whether evidence should be excluded when an unconstitutional action leads to the discovery of a valid arrest warrant. Thus, the analysis of Utah v. Strieff is applicable in this action and mandates that the defendant's subsequent statements, as well as evidence seized pursuant to the search warrants, not be excluded from evidence because of the unlawful search for identification documents during the Terry stop.[7]

## IV. THE VOLUNTARINESS OF DEFENDANT'S STATEMENTS

Defendant also seeks to exclude his videotaped statement on the grounds it was not voluntary. (Doc. # 30 at 7-12)

### A. Applicable Legal Standards

The voluntariness of a confession is a question of law. See United States v. Jordan, 150 F.3d 895, 898 (8th Cir. 1998). The government must prove by a preponderance of the evidence that the challenged statements are voluntary. See Lego v. Twomey, 404 U.S. 477 (1972); United States v. Astello, 241 F.3d 965, 966 (8th Cir. 2001). A confession is involuntary if it was extracted by threats, violence, or direct or indirect promises such that a person's will is overborne and his or her capacity for self determination critically impaired. See Astello, 241 F.3d at 967; United States v. Kilgore, 58 F.3d 350, 353 (8th Cir. 1995). Neither psychological tactics nor

---

[7] The defendant's other reasons for seeking to suppress evidence obtained from the execution of the search warrants as set forth in the motions to suppress, doc. ##28 and 29, will be addressed by a separate Report and Recommendation.

18

broken promises alone may be sufficient to render a confession involuntary. See Tippitt v. Lockhart, 859 F.2d 595, 597 (8th Cir. 1988); United States v. Astello, 241 F. 3d at 967-968. As the Supreme Court recognized in Haynes v. Washington, 373 U.S. 503, 515 (1963):

> [t]he line between proper and permissible police conduct and techniques and methods offensive to due process is, at best, a difficult one to draw, particularly in cases such as this where it is necessary to make fine judgments as to the effect of psychologically coercive pressures and inducements on the mind and will of an accused."

Thus, the Court must look to the totality of the circumstances, including all of the conduct of law enforcement officials and the suspect's capacity to resist pressure in determining if a statement was involuntary. See Jordan, 150 F.3d at 898. Some of the factors the Court may consider in assessing the totality of the circumstances include the age, education and intelligence of the accused; whether the accused has been informed of his constitutional rights; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food or sleep. See Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973). Whether the defendant was advised of his constitutional rights is only one of several factors courts examine in assessing the voluntariness of a confession. However, "'[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that law enforcement authorities adhered to the dictates of Miranda are rare.'" Simmons v. Bowersox, 235 F.3d 1124, 1132 (8th Cir. 2001)(citations omitted).

## B. Application of the Legal Standards to the Facts of This Case

Defendant seeks to exclude all statements made during his interview of August 27, 2015, on the basis they "were the product of unrelenting violations of his Fourth, Fifth and Sixth Amendment rights over a period of approximately 33 hours." (Doc. # 30 at 7) Defendant further

19

contends that a review of the video shows that he is "sleep-addled and confused about the purpose of the interview" and that he was "drowsy and incapable of knowing assent [sic] to being interviewed." (Doc. #30 at 9) Furthermore, defendant contends that he was "recently awakened, dehydrated, disoriented, deprived of toilet facilities and deeply fretful about his mother's incarceration." (Doc. #30 at 1)

In addition to testimony from Detective Spencer concerning the circumstances of the interview, the Court has reviewed the actual videotape in its entirety and finds that it confirms Detective Spencer's testimony and demonstrates that defendant's statements were voluntary. First, defendant was advised of his constitutional rights at the beginning of the interview and agreed to talk to the detectives. (See Fact No. 12 and Gov. Ex. 3) The interview lasted approximately fifty minutes and shows the officers and defendant conversing in polite conversational tones. (See Fact No. 14 and Gov. Ex. 3) While defendant is seen yawning at several points in the video, there is nothing further to demonstrate, as defendant suggests, that he was sleep-addled or deliberately sleep deprived. Testimony was presented by Lieutenant Williams that at the jail where defendant was detained prior to his interview on August 27, lights were out at 10:00 p.m. during weekdays and 11:00 p.m. on weekends, inmates were not required to get up for breakfast, and inmates were allowed to go back to bed after breakfast. (See Fact Nos. 17 and 18) In fact, when the interview started at 9:30 a.m. on August 27, 2015, defendant states that he had just woken up. (See Gov. Ex. 3) There is no evidence to support a claim that defendant was deliberately sleep deprived prior to the interview.

Defendant also complains of "promises" being made as a result of officers saying that his honesty and cooperation would help not only him, but his mother as well. (Doc. # 30 at 10-11)

20

Officers do tell the defendant that honesty will be the best policy in helping himself and his mother. However, case law is clear that this is not an express or implied promise somehow rendering a confession involuntary. See Simmons v. Bowersox, 235 F.3d 1124, 1133 (8th Cir. 2001) and the cases cited therein.

Defendant was also advised that the federal authorities were looking into his case and likely to become involved. When he asked if they could help get him out of jail, the detective indicated that until his Arkansas issues were dealt with getting out of jail was not on the table. These statements were all true. Contrary to defendant's argument that he was dehydrated and deprived of water, it was the detective who asked the defendant if he wanted a glass of water and then brought him one. (See Gov. Ex. 3) At no time during the interview did defendant indicate a need to use the toilette facilities. At the end of the interview, as defendant is leaving the interview room, he can be heard asking, for the first time, to have an opportunity to use the bathroom. (See Gov. Ex. 3)

Not only did defendant's initial admissions come at the beginning of the interview, but it is clear that his will was not overborne during the less than one hour questioning. Toward the end of the interview, defendant is asked by the detectives if they could look at his phone. (See Gov. Ex. 3) Defendant refused to give officers the right to search his phone saying if they want a specific phone number he would provide the number, if he was allowed to look at the phone. (See Gov. Ex. 3) The officers then indicated they would get a warrant to search the phone.

Defendant also contends that he was denied access to a lawyer. Shortly after he denied consent to search his phone, defendant states that he has probably already said too much without a lawyer. (See Gov. Ex. 3). Detective Spencer then asks if he wants a lawyer and tells him that it

21

is his right to have a lawyer. (See Gov. Ex. 3) The detective goes on to say that if he asks for a lawyer one will not be available immediately, but that they will not ask him any further questions, and they will stop talking to him. After this explanation, the defendant asks the detectives; "What else you got?" (See Gov. Ex. 3) Under Eighth Circuit case law, this is not an unequivocal statement sufficient to invoke the right to remain silent. As the Eighth Circuit has explained:

> However, to invoke one's right to remain silent, one must unequivocally express his desire to remain silent. United States v. Al–Muqsit, 191 F.3d 928, 936 (8th Cir.1999). An assertion of one's Miranda rights must be neither ambiguous nor equivocal. See Davis v. United States, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (applying this standard in determining whether a suspect had invoked his right to counsel). To determine whether a defendant has unequivocally invoked the right to remain silent, the defendant's statements are considered as a whole. United States v. Johnson, 56 F.3d 947, 955 (8th Cir.1995).

Simmons v. Bowersox, 235 F.3d 1124, 1131 (8th Cir. 2001).

Further, it is clear from the video that the defendant was familiar with the criminal justice system as he indicated he had a pending case in Newton County with an upcoming court date that he did not want to miss.

The totality of the circumstances surrounding the defendant's videotaped statement demonstrates that defendant's statements were voluntary and not the result of coercion, lack of sleep, deprivation of water or denial of any of his Constitutional rights. Accordingly, the Court will recommend that the motion to suppress be denied based on the finding that the defendant's custodial statements were voluntarily and not coerced by threats, violence, or direct or indirect promises such that his will was overborne.

## V. CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant's Motion to Suppress Custodial Statement (Doc. # 30).

Counsel are reminded they have fourteen days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same. A failure to file and serve timely objections shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

*/s/ David P. Rush*
DAVID P. RUSH
UNITED STATES MAGISTRATE JUDGE
